# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| VICTOR THOMAS, | ) |
| Plaintiff, | ) |
| | ) No. 17 C 3324 |
| v. | ) |
| | ) Judge Ronald A. Guzmán |
| THOMAS J. DART, Sheriff of Cook County; COUNTY OF COOK, a unit of local government, as indemnitor; MICHAEL HOLMES; and NNEKA JONES TAPIA, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff, Victor Thomas, a former[1] employee of the Cook County Department of Corrections ("CCDOC"), brought this action after he was demoted. Thomas alleges race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1983. For the reasons explained below, the Court grants defendants' motion for summary judgment.

## MATERIAL FACTS

Plaintiff is an African-American male. (ECF No. 43, Pl.'s Resp. Defs.' Stmt. Facts ¶ 1.) Defendants are Thomas J. Dart, the Sheriff of Cook County; Nneka Jones Tapia ("Jones"),[2] who was the Executive Director of the CCDOC at the relevant time; Michael Holmes, who was a First Assistant Executive Director of Operations at the CCDOC at the relevant time; and Cook County, which is named as indemnitor. (*Id.* ¶ 4.)

---

[1]Plaintiff was laid off in late 2017. The layoff is not at issue in this case.

[2]Defendants' briefs refer to Nneka Jones Tapia as "Jones," not "Tapia," so the Court follows suit.

In 1990, plaintiff began his employment with the CCDOC as a correctional officer. (ECF No. 40-2, Dep. of Victor Thomas 16.) Over the years, he was promoted to Sergeant, Lieutenant, Captain, Chief, Commander, and Superintendent. (Pl.'s Resp. Defs.' Stmt. Facts ¶ 9.) As of 2014, plaintiff was Superintendent of Division VI. (*Id.* ¶ 10.) He reported directly to Mario Reyes, who was Assistant Executive Director, and from there the chain of command went upward as follows: Holmes; Tarry Williams, who was Chief of Operations; Jones; and Bradley Curry, who was Bureau Chief. (*Id.* ¶ 13.) As Executive Director, Jones was responsible for personnel decisions at the CCDOC and had the ability to recommend that an individual under her chain of command be promoted or demoted, but Curry had the ultimate authority to approve such recommendations.[3] (*Id.* ¶ 14.)

In December 2015, Jones decided, in consultation with Williams and CCDOC Chief of Staff Matthew Burke, that one assistant executive director and seven CCDOC superintendents, including plaintiff, should receive Performance Improvement Plans ("PIPs"). (*Id.* ¶ 16.) The purpose of the PIP was to identify areas of improvement for each individual who received one. (*Id.* ¶ 17.) In deciding who should receive a PIP, Jones, Williams, and Burke considered the

---

[3]Plaintiff denies this fact, but the denial is not properly supported. Plaintiff cites his own deposition testimony for the proposition that "Jones was the face of [the] company, but Holmes called the shots." (Pl.'s Resp. Defs.' Stmt. Facts ¶ 14.) That response is not germane to the scope of Jones's job responsibilities and authority, so the Court deems the statement admitted. *See Curtis v. Costco Wholesale Corp.*, 807 F.3d 215, 218 (7th Cir. 2015) (when a responding party's statement fails to dispute the facts set forth in the moving party's statement in the manner dictated by Local Rule 56.1, those facts are deemed admitted for purposes of the motion). And plaintiff submits several other improper responses to defendants' statements of fact. He fails to support his denial of paragraph 19 with any citation to evidence. He attempts to support several other denials with evidence that does not support the denial (and, in some instances, supplies additional facts that are not germane to the statement). (Pl.'s Resp. Defs.' Stmt. Facts ¶¶ 16, 18, 28, 36, 39, 40, 51.) Therefore, the Court deems those statements admitted. The Court has also disregarded immaterial facts.

individual's work performance and whether they were satisfied with that performance. (*Id.* ¶ 18.) Holmes was not involved in the PIP process and did not influence Jones, Williams, or Burke in their decision to give plaintiff a PIP. (*Id.* ¶ 19.) On December 22, 2015, Jones sent Curry an email notifying him of her decision to issue PIPs to certain individuals. (*Id.* ¶ 20.)

The PIPs were issued shortly thereafter. Plaintiff's PIP identified specific examples of current performance deficiencies that were under review, including that Division VI had to "be free from excessive property and contraband"; division staff were not following proper security protocol; staff complaints had to be addressed; "system checks" were not being conducted as required by general order; sanitation in the division was not within acceptable standards; and internal movement and control of inmates had to be properly performed. (*Id.* ¶ 24; Thomas Dep., Ex. 11, at 1.) Plaintiff's improvement plan tasks included "[e]nsuring proper compliance checks and shakedowns are being completed"; cuffing offenders properly; making rounds in the division to address staff and inmate complaints and issues; supervising inmate cleaning crews to ensure cleanliness and sanitation; reading incident reports from the division to "address any discrepancies and apply corrective action"; monitoring the staff assigned to the barbershop; and meeting periodically with supervisors to ensure that the CCDOC's mission and goals were being carried out. (Thomas Dep., Ex. 11, at 1-2.)

After issuing the PIPs, Jones, Williams, and Burke met with the recipients to discuss their work performance. (Pl.'s Resp. Defs.' Stmt. Facts ¶ 21.) On January 11, 2016, Jones and Williams met with plaintiff to discuss his PIP; Burke participated by telephone. (*Id.* ¶ 26.) Holmes did not participate in the meeting and did not know it was taking place. (*Id.* ¶ 27.) According to Jones, during the meeting, plaintiff was defensive; disagreed with the items identified in the PIP; claimed that he ran Division VI well; and could not comprehend a need for

improvement. (*Id.* ¶ 28.) At his deposition, plaintiff stated that the performance deficiencies identified in the PIP were not "true" or "based on the facts," and he described himself at the meeting as having been "respectfully inquisitive" about the listed deficiencies. (Thomas Dep. 180.) Plaintiff stated as follows: "[A]s we went down [the list], . . . I was saying I do this and I do these things that they say that I didn't do that I do—I do—I actually perform those tasks." (*Id.*) Plaintiff further stated: "I was respectful, inquisitive. I asked questions, and I respectfully said that this is not true, and it's not true." (*Id.* at 198.) When asked about Jones's statement in a subsequent email to Curry that plaintiff "presented as defensive throughout the discussion and challenged every provision that was discussed," plaintiff agreed that it was "a fair representation that [he was] defensive and challenged every provision." (*Id.* at 201.) Plaintiff also acknowledged that he had said during the meeting that he "ran his building well and did not understand how [his superiors had] identified the areas in need of improvement." (*Id.* at 202.)

Due to plaintiff's rejection of the PIP, Jones decided to inspect Division VI the same day of the meeting, to make sure that the PIP was accurate and that there had not been improvement of which she was unaware. (*Id.* ¶¶ 30-31.) Jones and Williams visited Division VI, and Reyes and Holmes were present. (*Id.* ¶ 31.) Plaintiff did not accompany them during the inspection. (*Id.* ¶ 32.) During the inspection, Jones found several deficiencies that she characterizes as safety, security, and sanitation concerns: the tunnel entrance to the division was unlocked; inmates had clotheslines in their cells and multiple mattresses; the division had lacked hot water for two weeks; sheets were piled in the hallways; a supervisor's jacket was accessible to inmates; and both a janitor's closet and a dispensary medication cart were unlocked. (*Id.* ¶ 33.) Plaintiff denies that any of these issues constituted safety, security, or sanitation concerns, and denies that the building's plumbing was within his control. He also points out that there was an officer

4

posted by the door in the basement, who let Jones and Holmes in with a key; the sheets were piled up because a laundry exchange was occurring; and the jacket was inside a sergeant's office. (*Id.*)

After the inspection, Jones, Williams, Holmes, and Reyes met with plaintiff in his office. (*Id.* ¶ 35; Thomas Dep. 186-87.) In Jones's opinion, during the meeting plaintiff continued to challenge Jones and her findings. (Pl.'s Resp. Defs.' Stmt. Facts ¶ 36.) Plaintiff says that he merely stated, "I didn't know I was that bad." (Thomas Dep. 214-15.) After the meeting, Jones sent an email to Curry that day (copying Williams and Burke) in which she attached the signed PIPs for the employees who had received them and stated the following: all of the meetings had gone "well," "with the exception of [that of] Victor Thomas"; Thomas was "defensive" and "reported that he ran his building well and did not understand how we identified the areas in need of improvement"; she advised Thomas that she would be visiting his division; and later in the day, she visited the division for a 1.5 hour tour along with Williams, Holmes, and Reyes, during which Thomas "did not present himself." (Pl.'s Resp. Defs.' Stmt. Facts ¶¶ 34, 37, 40; ECF No. 40-1, Decl. of Nneka Jones Tapia, Ex. 1, at 3-4.) Jones summarized her findings from the inspection and stated that she met with Thomas afterward and he "continued to challenge us." (Jones Decl., Ex. 1, at 4.) She further stated: "We attempted to identify and review the deficiencies that have been noted with Superintendent Thomas for the last 6 months, however it was met with such resistance that it is clear that he is not willing to work on the issues. As a result, I am requesting immediate demotion." (*Id.*) When Jones decided to request plaintiff's demotion, she was not influenced by anything in plaintiff's personnel file. (*Id.* ¶ 41.)

Curry received Jones's email and, in an email dated January 12, 2016, he approved the demotion. (*Id.* ¶¶ 43-44.) On January 29, 2016—during the time between Curry's approval of

5

the demotion and the time plaintiff was notified of it—Division VI was inspected by Superintendent Martha Yoksoulian and Assistant Executive Director Robert Lyles. (ECF No. 45, Defs.' Resp. Pl.'s Stmt. Add'l Facts ¶ 26.) Yoksoulian and Lyles produced two reports that were sent to Holmes and, in Holmes's view, "reflected nothing wrong with Division VI." (*Id.* ¶ 27.) Holmes did not tell Jones about the January 29 inspection, and Jones testified that she had not seen the reports prior to preparing for her deposition in this case. (*Id.* ¶¶ 10, 31.) On February 16, 2016, Jones informed plaintiff that he was being demoted from Superintendent to Commander. (Pl.'s Resp. Defs.' Stmt. Facts ¶ 45.) After the demotion, plaintiff became Commander of Division VIII at the CCDOC and was paid $2.50 per hour less than he was paid as a superintendent. (*Id.* ¶ 50.) Sean Julian, a white male, replaced plaintiff as Superintendent of Division VI. (*Id.* ¶ 52.) In July 2016, Julian transferred out of Division VI for reasons not related to performance, and Don Beachem, an African-American male, became Superintendent of Division VI. (*Id.*; Defs.' Resp. Pl.'s Stmt. Add'l Facts ¶ 37.)

On December 13, 2016, plaintiff filed an amended charge of discrimination with the Illinois Department of Human Rights, alleging that he was demoted to the position of Commander because of his race. Plaintiff filed the instant action on May 3, 2017. The complaint is organized into two counts. Count I alleges disparate treatment in violation of Title VII based on race discrimination. Count II is a claim under 42 U.S.C. § 1983 for race discrimination in violation of the Equal Protection Clause.

## DISCUSSION

**A.     Summary-Judgment Standards**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.

R. Civ. P. 56(a). A factual dispute is "genuine" only if a reasonable jury could find for either party. *Nichols v. Mich. City Plant Planning Dep't*, 755 F.3d 594, 599 (7th Cir. 2014). The Court must construe the evidence and all inferences that reasonably can be drawn therefrom in the light most favorable to the nonmoving party. *Kvapil v. Chippewa Cty.*, 752 F.3d 708, 712 (7th Cir. 2014). Rule 56 imposes the initial burden on the movant to inform the court why a trial is not necessary. *Modrowski v. Pigatto*, 712 F.3d 1166, 1168 (7th Cir. 2013). Where the nonmovant bears the ultimate burden of persuasion on a particular issue, the movant's initial burden may be discharged by pointing out to the court that there is an absence of evidence to support the nonmoving party's case. *Id.* Upon such a showing, the nonmovant must then "make a showing sufficient to establish the existence of an element essential to that party's case." *Id.* (internal quotation marks and citation omitted). The nonmovant need not produce evidence in a form that would be admissible at trial, but he must go beyond the pleadings to demonstrate that there is evidence upon which a jury could find in his favor. *Id.* at 1168-69 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

**B.     Analysis**

Plaintiff alleges that defendants demoted him because he is African American. The applicable standard at summary judgment is whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race caused his demotion. *See Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *Lavalais v. Vill. of Melrose Park*, 734 F.3d 629, 635 (7th Cir. 2013) (Title VII and § 1983 race discrimination employment claims are analyzed under the same standards). "In applying this standard, evidence must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 547-48 (7th Cir. 2017).

Plaintiff must show that a reasonable factfinder could conclude that his race influenced Jones's decision to demote him. He contends that Holmes caused Jones to demote him, under a "cat's paw" theory of liability for discrimination. The cat's paw theory applies "when a biased subordinate who lacks decision-making power uses the formal decision-maker as a dupe in a deliberate scheme to trigger a discriminatory employment action." *Milligan-Grimstad v. Stanley*, 877 F.3d 705, 711 (7th Cir. 2017). "To survive summary judgment on such a theory, the plaintiff must provide evidence that the biased subordinate actually harbored discriminatory animus against the victim of the subject employment action, and evidence that the biased subordinate's scheme was the proximate cause of the adverse employment action." *Id.* (internal quotation marks and citation omitted).

It is plaintiff's view that because Holmes had "micromanag[ed]" him in the past and, in his opinion, treated plaintiff poorly by, among other things, initiating discipline that was not sustained (ECF No. 42, Pl.'s Resp. Defs.' Mot at 1-2), Holmes must have had something to do with his demotion. Plaintiff cites Holmes's presence at a December 2015 meeting of superintendents where it was announced that PIPs would be issued to some of them; his presence at the January 11, 2016 inspection and post-inspection meeting in plaintiff's office; and his presence at, and the fact that plaintiff perceived Holmes to be "smirking" during, the February 2016 meeting at which plaintiff was informed of his demotion. (*Id.* at 4-5.) Plaintiff also cites Holmes's position in the CCDOC chain of command, and notes that his position was "central" such that "communications from lower-ranking staff" were routed through Holmes, as was information from Jones that "flow[ed] through . . . Holmes downward." (*Id.* at 5.) According to plaintiff, "there is a credibility problem in the narrative spun by the individual Defendants . . . which, in essence, is that Holmes had nothing to do with the demotion, and Jones made the

8

complete and total decision without ever consulting Holmes." (*Id.*) Plaintiff also notes that Holmes had worked in management positions at the CCDOC for decades, whereas Jones began her stint as Executive Director in May 2015. (*Id.*)

Jones states that she did not speak with or email with Holmes about the PIP process, and Jones, Holmes, Williams, Burke, and Curry all deny that Holmes had any involvement in or influence on Jones's and Curry's decision to demote plaintiff. Plaintiff submits no evidence whatsoever to support his contention that "[t]he entire process was tainted with Holmes' discriminatory motive." (Pl.'s Resp. Defs.' Mot. at 7.) There is no evidence that Holmes had any race-based animus against plaintiff. His presence at certain events that preceded plaintiff's demotion is not at all "curious," as plaintiff suggests, (*id.* at 5); Holmes was in the supervisory chain above plaintiff. Furthermore, Holmes's mere position in the chain of command and comparative experience at the CCDOC fail to create a genuine issue as to whether Jones relied on any input from him in making the decision to request plaintiff's demotion or as to whether he was involved in the demotion decisionmaking process. Plaintiff's unsupported hunch about Holmes's involvement and his argument that defendants have a "credibility problem" are insufficient to avoid summary judgment. Plaintiff asserts that at this stage of the proceedings, his contention that Jones was Holmes's "cat's paw" is "taken as true," (Pl.'s Resp. Defs.' Mot. at 8, 15), but that is not the case when there is no evidence that supports the contention. *See Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008) ("[W]hen challenges to witnesses' credibility are *all* that a plaintiff relies on, and he has shown no independent facts—no proof—to support his claims, summary judgment in favor of the defendant is proper."); *Harper v. C.R. England, Inc.*, 687 F.3d 297, 306 (7th Cir. 2012) ("[O]ur favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture.") (internal

quotation marks, brackets, and citation omitted); *Rand v. CF Indus., Inc.*, 42 F.3d 1139, 1146 (7th Cir. 1994) ("Inferences and opinions must be grounded on more than flights of fancy, speculations, hunches, intuitions, or rumors, and discrimination law would be unmanageable if disgruntled employees could defeat summary judgment by affidavits speculating about the defendant's motives.") (internal quotation marks, brackets, ellipsis, and citation omitted). A reasonable jury could not find that Jones, serving as Holmes's cat's paw, requested plaintiff's demotion because of plaintiff's race.

Defendants have provided legitimate, nondiscriminatory reasons for demoting plaintiff: when he was confronted with performance deficiencies in the division for which he was responsible, he challenged his superiors' findings in the PIP meeting as well as after their inspection of the division, and he demonstrated an unwillingness to try to improve his performance. Plaintiff asserts that these reasons were actually pretext for racial discrimination. "Pretext involves more than just faulty reasoning or mistaken judgment on the part of the employer; it is a lie, specifically a phony reason for some action." *Ennin v. CNH Indus. Am., LLC*, 878 F.3d 590, 596 (7th Cir. 2017) (internal quotation marks, brackets, and citation omitted).

In support of his pretext argument, plaintiff first argues that he had never previously been the subject of sustained discipline during his career at the CCDOC. Such a general assertion of past satisfactory job performance is insufficient to create a factual issue about an employer's assessment of specific performance deficiencies, *Dey v. Colt Construction & Development Co.*, 28 F.3d 1446, 1460 (7th Cir. 1994), nor does it address the other components of the explanation for plaintiff's demotion: his reactions to being confronted with performance deficiencies and

Jones's resulting belief that plaintiff was unwilling to address those deficiencies.[4]  Plaintiff next argues that Jones's opinion about his attitude is "not to be believed" because he has a "calm, soft-spoken voice" and there is no evidence that he raised his voice, used inappropriate language, or was rude or offensive during the PIP process or meeting after Jones's inspection of Division VI. (Pl.'s Resp. Defs.' Mot. at 10.)  Plaintiff's demeanor during the meetings is beside the point; his demeanor was not the focus of Jones's consternation.  Rather, it was the substance of his responses to the identified performance deficiencies; plaintiff admits that he was defensive and challenged each one.  Plaintiff also points to the fact that Lyles and Yoksoulian gave his division a passing grade when they inspected it on January 29, 2016.  But the result of that inspection does not support an inference of pretext when the inspection was conducted more than two weeks after Jones had sought and received permission from Curry to demote plaintiff.  Plaintiff also cites the fact that a white superintendent, Sean Julian, took over in Division VI after he was demoted.  That fact is not enough to raise a genuine issue that plaintiff's demotion was race-based, considering that a few months later, an African-American superintendent, Don Beachem, took over Division VI after Julian's departure.  *See Carson v. Bethlehem Steel Corp.*, 82 F.3d

---

[4]Plaintiff contends that Jones lacked personal knowledge of his performance at the time of the PIP meeting.  That argument is unsupported, and it ignores the evidence that Jones consulted with Burke and Williams in issuing the PIPs.  The Court also rejects plaintiff's contention that defendants have "shifted the explanation for the demotion." (Pl.'s Resp. Defs.' Mot. at 11.)  Plaintiff discusses the fact that at Jones's deposition, she answered questions about occasions in 2015 when she had directed plaintiff to remove a particular inmate from a work assignment in Division VI's barbershop because the inmate did not meet criteria for that assignment; the inmate later returned to the barbershop; and Jones again had to direct plaintiff to remove the inmate from the barbershop.  Jones, however, never cited the barbershop events as the rationale for plaintiff's demotion.  Plaintiff's counsel asked her about the event and later asked her if it was a "factor" in her decision to demote plaintiff, and she responded that she "weighed" it.  She did not say that the incident precipitated or was the reason for plaintiff's demotion.  Moreover, Jones's testimony about the barbershop events is entirely consistent with the inclusion of the improvement plan item in plaintiff's PIP that referred to monitoring assigned barbershop staff.

157, 159 (7th Cir. 1996) ("The question . . . is whether the plaintiff has established a logical reason to believe that the decision rests on a legally forbidden ground. That one's replacement is of another race . . . may help to raise an inference of discrimination, but it is neither a sufficient nor a necessary condition."). Plaintiff further argues that there are similarly-situated employees outside his protected class who were treated more favorably than he was, but he presents a perfunctory argument regarding which superintendents were similarly situated to him. He also fails to identify any other superintendents who received a PIP and challenged the listed performance deficiencies and/or expressed resistance to improvement. Plaintiff fails to point to any evidence tending to show that defendants did not demote him due to performance deficiencies and his reaction to the PIP.

There is simply no evidence of racial animus in the record. Considering the evidence as a whole, the Court concludes that no reasonable factfinder could conclude that plaintiff's race caused his demotion. Defendants' motion is therefore granted in its entirety.

## CONCLUSION

Defendants' motion for summary judgment [37] is granted, and judgment will be entered in favor of defendants and against plaintiff. Civil case terminated.

**DATE**: July 24, 2018

_Ronald A. Guzmán_

_____
    **Ronald A. Guzmán**
    **United States District Judge**